UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Crim. No. 23-mj-4293-DHH |
| | ) | |
| v. | ) | |
| | ) | |
| JACK DOUGLAS TEIXEIRA, | ) | |
| | ) | |
| Defendant. | ) | |

**GOVERNMENT'S SUPPLEMENTAL MOTION IN SUPPORT OF
PRETRIAL DETENTION**

Pursuant to the Court's electronic Order entered on May 15, 2023, the government files this supplemental submission in support of its motion for detention of Defendant Air National Guardsman Jack Douglas Teixeira ("the Defendant"). Since the last court appearance on April 27, 2023, and notwithstanding extensive efforts by the Defendant to frustrate the government's ability to ascertain the full scope of classified national defense information that he compromised (as detailed in the government's original motion), the investigation into this matter has continued.

Additional evidence—including the Defendant's own words about his motive and actions—has now come to light, which compounds the national security and public safety risks that the government previously noted to the Court. That evidence belies the Defendant's efforts to minimize his criminal conduct and undercuts the Defendant's claim that he can be trusted to adhere to conditions of release imposed by the Court. In short, the weight of the evidence against the Defendant has only grown stronger, and the risks the Defendant poses if released have only come into sharper focus. Because no condition or combination of conditions would satisfy the concrete and serious concerns raised by the government, the Defendant should remain detained.

1

I. <u>Defendant's Illegal Activities, Including the Gathering and Disseminating of Classified Information Pose Continuing Risks to the National Security of the United States.</u>

The Government's detention motion identified the concrete and serious harms to national security that the Defendant's actions have caused and the real risks that those harms could be compounded if the Defendant is released. In its Memorandum in Support of Release on Behalf of Jack D. Teixeira, [Dkt. 20], defense counsel sought to defuse these harms by arguing that the "government's allegations in its filings . . . offer no support that Mr. Teixeira currently, or ever, intended any information purportedly to the private social media server to be widely disseminated." [Dkt 20, p. 40]. Along these same lines, at the April 27, 2023 detention hearing, defense counsel described the specific server in which the Defendant shared information as a "small private online community" and contended that there was no "suggestion that Mr. Teixeira himself ever intended anything to be widely available." These efforts to minimize the Defendant's criminal activities were facially unpersuasive at the hearing and have only been further undercut by the government's continued investigation.

Contrary to the Defendant's portrayal, the government's investigation makes clear that the Defendant directly posted classified information to multiple servers on the social media platform over the course of many months. One of those servers had at least 150 users at the time the information was posted and now may have many more users that are actively seeking access to classified information.[1]  *See* Attachment A, Declaration of FBI Special Agent Luke Church ("Church Declaration"). Among the individuals with whom the Defendant shared government information are a number of individuals who represented that they resided in other countries and

---

[1] While mindful that public reporting does not necessarily replace law enforcement investigation, the government is aware of claims that persons continue to seek out the classified documents. *See* Jessica Donati, *A Global Scavenger Hunt for Classified Documents Pits Gamers v. Feds, Wall St. J.,* May 15, 2023.

who logged on to the social media platform using foreign IP addresses. *Id.* Putting aside that the provision of Top Secret national defense information to even one person not entitled to receive it could cause exceptionally grave damage to the U.S. national security and would violate the statutes outlined in the Complaint against the Defendant, here, the Defendant's willful transmission of classified information over an extended period to more than 150 users worldwide grossly undermines the notion of a limited transmission to a "small private" community and refutes the Defendant's self-serving narrative that he failed to appreciate the harms that his activities could cause. The Defendant cannot now be trusted to refrain from causing further harm.

In the first place, it is clear that the dissemination of the classified national defense information that the Defendant unlawfully posted was even more widespread and diverse than previously known. It is also clear that the Defendant publicly exalted in the breadth and sensitivity of the information that he was disclosing. As set forth in the Church Declaration, the Defendant boasted about the wide swath of classified information he had access to by virtue of his position[2] and encouraged efforts to broaden his unauthorized disclosures beyond the war between Russia and Ukraine. For example, on January 4, 2023, the Defendant stated:

> Teixeira: theres gonna be a fuck ton of information here
> . . .
> Teixeira:  it may be irrelevant, but its not just ukraine i cover
> Teixeira: i have stuff for israel, palestine, syria, iran, china
> Teixeria: SE asia, sometimes western europe
> Teixeira: DPRK, ROK
> Teixeira: i don't usually cover south america that much anymore
> Teixeira: before the war i was assigned to middle eastern intelligence gathering tasks

---

[2] In a record the government received from the social media platform where the Defendant originally posted classified national defense information, the Defendant described his job in a November 19, 2022 message as doing "foreign intel" in "usaf intelligence." *See* Attachment A. He further stated that as part of his role, he worked with "NRO, NSA, NGA, and DIA people mostly." *Id.* On the same day, the Defendant said "I'm on JWICS [Joint Worldwide Intelligence Communications System] weekly" and "[k]nowing what happens more than pretty much anyone else is cool." *Id.* In a subsequent message from January 26, 2023, he again bragged, "I work in Air Force intel." *Id.*

3

In the same chat, the Defendant made clear his understanding of the unlawfulness of his disclosures, adding that "none of this is public information." *Id.* The Defendant had previously acknowledged on the social media platform that the information to which he had access required him to sign a non-disclosure agreement. *Id.* His persistent efforts to obtain and disclose classified information—in total contravention of his legal obligations and written commitments—was palpable as he wrote, "man, how fucked up is it i can type out all this shit and still be ready for more but can barely get through a two page college paper."[3] *Id.*

At the same time, the scope of the Defendant's willful disregard of his obligations to protect such information has only come into sharper focus. In particular, the Defendant's disclosures (and associated boasting) continued even after being admonished by his superiors on two separate occasions—once in September 2022 and once in October 2022—amid concerning actions that the Defendant took related to classified information. *See* Attachments B-1, B-2. On these occasions, the Defendant met with his superiors and was instructed to no longer take notes in any form on classified intelligence information and to "cease-and-desist on any deep dives into classified intelligence information." *Id.* Yet, in February 2023, the Defendant was again observed viewing content that was not related to his duties. *See* Attachment B-3.

The Defendant even continued to share information with his online associates, defying these admonishments and taking further efforts to conceal his unlawful conduct. On December 6, 2022, the Defendant acknowledged that he was "breaking a ton of UD regs" (a reference to "unauthorized disclosure")[4] but said, "Idgaf what they say I can or can't share." He went on to

---

[3] Moreover, that the Defendant claimed to have information on multiple countries, which presumably spans a wide range of topics, only serves to increase his value to any one of those countries who might be interested in facilitating the Defendant's flight.

[4] The Defendant was well aware of his obligations with respect to Unauthorized Disclosure and Classified Information regulations, having completed training in both subjects both in March 2022 and March

state that "[a]ll of the shit I've told you guys I'm not supposed to," acknowledging that "It's TS/SCI"—a reference to the top secret and sensitive compartmented information classification level of the information he was disseminating. He also bragged about the scope of information to which he had access, stating, "The information I give here is less than half of what's available." *Id.*

That the Defendant continued posting classified information despite keen awareness that he was violating the law and even after being admonished multiple times by superiors is a clear indication that he will be undeterred by any restrictions this Court places upon him and will not hesitate to circumvent those restrictions if he deems it in his interest to do so. His own posts make clear that he simply did not care what his government or his superiors told him he could or could not share, and the government submits that he would not give any more weight to whatever conditions the Court imposes. Moreover, his efforts to circumvent and conceal his illegal activities while on base in a classified facility is at odds with any notion that he would not find ways to circumvent restrictions imposed on him at his home—perhaps aided by one of the many foreign adversaries and threat actors who would no doubt salivate at the prospect of assisting him in evading the jurisdiction of the United States. As the government argued in its prior filing, and based on the facts above, no conditions this Court could impose would address the risks that his release poses.

II.     History and Characteristics of the Defendant

Defense counsel has argued that the Bail Reform Act permits the court to consider, among other things, the Defendant's "present character [and] physical and mental condition." The

---

2023—a period of time during which the Defendant repeatedly transmitted classified national defense information to those not authorized to receive it. *See* Attachment C.

government acknowledges that the Defendant's character is a valid legal consideration and submits that it weighs strongly in favor of detention.

As the government has previously argued, the Defendant's history suggests that he would use any opening to his advantage and has proven himself to be adept at offering false deflections of his prior conduct and evading restrictions placed on him. That history directly contradicts the self-serving narrative that the Defendant has advanced of his own character and morality. Among the conduct that could be contrasted with what the defense alleged to be the Defendant's peaceful reading of the Bible prior to his arrest is a recent video that has now been publicly published by *The Washington Post*. That video depicts the Defendant using racial and ethnic slurs while firing at a target, "emptying the magazine of bullets" and ending his statement with "I mag dump" which refers to the act of firing at a target continuously or repeatedly until the magazine of ammunition is empty.[5]

---

[5] *See* Shane Harris et. al., *Alleged Leaker Fixated on Guns and Envisioned 'Race War,'* Wash Post (May 13, 2023), https://www.washingtonpost.com/national-security/2023/05/13/jack-teixeira-discord-leaked-documents/



Jack Teixeira uses slurs while at a firing range in Raynham, MA. (Video: Obtained by the Washington Post)

In short, there is every indication that the Defendant is skilled and experienced at hiding these unsavory aspects of his character. His skill derives from a pattern that the Defendant has followed throughout his life and in his career, whether it is having school detention pared down due to a self-described "misunderstanding," or obtaining a gun permit by touting his role in the U.S. Air Force. The Defendant acknowledged his deceit in a conversation on the social media platform in January of 2023 in which he and another user discussed background investigations. *See* Attachment A. That user, who appeared to be undergoing a background check of his own, told the Defendant that the user was "spooked about my account for my back ground check" and went on to ask the Defendant to "ban my ass from your server and select the delete all message history option." The user explained that "im just going through background checks rn [right now] so im being extra careful." The Defendant replied, "i understand" and "i went through the same thing getting my ts/sci" referring to his security clearance. In other words, while the Defendant may have provided carefully curated information to his background investigator about the

7

"misunderstanding" in high school, he certainly did not reveal—and potentially took action to actively conceal—the significant volume of racist, antisemitic, and violent rhetoric he posted online lest his true nature and character prevent him from achieving his objective.

The government submits that these facts, in combination with the significant evidence of obstruction the government has already presented, reveal the defendant's true nature—one of self-serving deceit. Accordingly, the Court should have no degree of confidence that any condition or combination of conditions imposed will be followed by the Defendant throughout the duration of this matter.

   III.   <u>Military Justice Oversight is not Available.</u>

During the detention hearing, defense counsel stated that it was their "understanding that if the Court does release Mr. Teixeira and does not confine him to his father's house at all times that Mr. Teixeira would still have orders to report for duty. He's still under the control of the Air Force. It's our understanding that the Air Force would be able to transport him to and from that duty by Air Force personnel under direct supervision, and he would not be in any sensitive position. I think some sort of assignment in the chaplain's office, in the gymnasium, some other area where he'd have duty because he's under their control." Counsel went on to describe the military aspect as an "extra layer of support and supervision." [Detention Tr. p. 49].

Contrary to the assertions of defense counsel, and as set forth in the attached Declaration by Colonel Ryan N. Hoback, a military justice attorney for the Directorate Judge Advocate, Air National Guard, pursuant to 18 U.S.C. § 1385, and "with limited exceptions not applicable here, federal law prevents the Army, Navy, Marine Corps, Air Force, and Space Force from assisting local law enforcement in enforcing civilian laws." *See* Attachment D, Hoback Declaration, at 3. Moreover, there is no oversight of the type described by the defense. While military personnel

may "conduct morale visits, room inspections, and stay attuned to quality of life needs of dorm occupants . . . [a] civilian home in North Dighton is neither a dormitory nor community house. A First Sergeant could not freely enter and inspect a civilian home without consent." *Id.* at 5. Finally, "it is neither a role nor responsibility of a First Sergeant to escort Air Force personnel to and from work . . . ." *Id.* at 6. For these reasons, the Court should lend no weight to the defense's assertions that the Defendant would be adequately supervised by some non-existent military authority.

    IV.    <u>Release to Defendant's Father Will Not Reasonably Assure the Appearance of the Defendant or the Safety of the Community</u>

At the April 27, 2023 detention hearing, the Defendant's father appeared before the court and indicated that he could step into the role of third-party guardian to assure the Court that his son would abide by the conditions of release. The Defendant's father lives alone and advised that he works what is essentially a ten-hour day at a location that is a one-hour and ten-minute drive from his home. Under questioning by defense counsel as to what devices were present in the home, the Defendant's father explained that he had agreed to remove any devices from his home which had internet access, including disabling a television. The Defendant's father was asked by defense counsel what actions he would take if he saw the Defendant violating his conditions of release. His answer was "I would either call him [the Defendant] or call whoever it was necessary that I'm instructed to call." [Detention Tr. p. 16]. If that was, in fact, the case, it appears that there is a phone at the residence and that the Defendant would have the ability to reach out to others and that other individuals, in turn, could reach out to him.

Other family members live within "the same neighborhood" according to the Defendant's father. The Defendant, therefore, could easily be contacted by other individuals—including friends or family who live nearby—who could, for example, leave a cell phone or items for him in the mailbox, which is on the roadway. There are myriad ways the Defendant could easily obtain

a phone or money or car keys without his father's knowledge. Put simply, nothing short of constant supervision—in other words, detention—can prevent the Defendant from accessing phones, internet, or other illicit devices during the pendency of his trial.

Conclusion

When the Defendant states that he will abide by conditions of release that this Court might set, it is not the first time he has made such a promise in a matter of importance. Pursuant to his enlistment, the Defendant promised to keep the national security secrets of the United States safe and to uphold and defend the Constitution. Despite being warned of the consequences of breaking that promise, the Defendant ignored his oath and published sensitive, top-secret documents for his own pleasure. The Court should have no confidence that the promises he might make in this proceeding would mean any more to him than the many promises the Defendant has already broken.

The government respectfully submits that the Defendant should be detained pursuant to 18 U.S.C. § 3142(f)(2)(A) and (B).

Respectfully submitted,

RACHAEL S. ROLLINS
United States Attorney

/s/ *Nadine Pellegrini*
NADINE PELLEGRINI
JARED C. DOLAN
JASON CASEY
Assistant United States Attorneys

MATTHEW G. OLSEN
Assistant Attorney General

/s/ *Christina A. Clark*
CHRISTINA A. CLARK
Trial Attorney
National Security Division

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/S/ Nadine Pellegrini*

NADINE PELLEGRINI
Assistant United States Attorney

Date: May 17, 2023